UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSHUA GOODWIN,

                    Petitioner,                    **REPORT AND RECOMMENDATION**
          -vs-                                     **No. 03-CV-0031(RJA)(VEB)**

GEORGE DUNCAN, Superintendent,

                    Respondent.

_____

## I.     Introduction

        *Pro se* petitioner Joshua Goodwin ("Goodwin" or "petitioner") has filed a petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his state-

custody following a judgment entered convicting him of second degree (intentional) murder.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1) for the

purpose of hearing and reporting on the merits of Goodwin's petition. For the reasons that

follow, I recommend that Goodwin's request for a writ of habeas corpus be denied and the

petition be dismissed.

## II.    Factual Background

        Shortly after midnight on February 8, 1998, Rochester Police Department Sgt. Thomas

Jansen responded to 236 Breck Street, where he found the badly beaten body of LaShawn

Morgan ("Morgan" or "the victim") lying on the sidewalk. Jensen testified at the suppression

hearing that there was a lot of blood around the victim, and a large puddle of blood or by as well

as drag marks and blood stains leading across the road, up the driveway, and onto the porch of

231 Breck Street. The drag marks appeared to have had water poured over them, which had

-1-

frozen. The officers followed the drag marks to the front door of 231 Breck St.; as the door was ajar, they entered the house. The officers smelled bleach when they entered the house, and also noticed a portion of a crowbar with blood on it lying on the carpet as well as a wet-dry shop vacuum, and two cans of paint. They followed a trail of blood up the stairs where, on the second floor landing, they observed several pots and pans one which was filled with soapy water, and a bottle of Ivory liquid dish soap.

When they reached the landing, a police officer state officer stationed outside the house radioed to them saying that there was someone lying on the roof of the house who had not moved or responded when she was addressed. When the officers inside the house on Breck Street entered the bedroom they saw through the window a person lying on the roof of the house. In response to their questions, the individual replied that she was sleeping; however, the outside temperature was about 10 to 15°F, and she was not wearing a coat. The police asked her to come inside the apartment and she complied, although she seemed to be "very agitated and upset."

The woman on the roof was later identified as Renetta Thomas, Goodwin's live-in girlfriend. The officers did not find any other individuals inside the apartment. One officer found Goodwin's wallet on the couch; the identification inside listed Goodwin's address as 231 Breck Street. As the officers left the house to conduct further investigation, they saw what appeared to be blood stains on the edge of the front door to the house.

Thomas, was taken to police headquarters for questioning. She informed the police that she lived at 231 Breck Street with Goodwin, whom she described as her boyfriend. In the first story she told police, she stated she had been a party earlier that night where she had had an

argument with petitioner. She left the party with two men, "Marlin" and "Squeak," and returned to her apartment. According to Thomas, "Squeak" started to get physical with her, and "Marlin" hit "Squeak" with a crowbar and dragged him outside. During this interview, Thomas displayed a "protective" attitude whenever petitioner's name was mentioned.

At 4:21 AM Thomas signed a consent- to-search form for the apartment. She also asked and asked and received permission to write a note to petitioner to leave at 231 Breck Street. The note stated as follows, "2-80-98. Joshua, I got arrested. Come see me. I told them you are just my friend. Call Luke. I'm going to call a lawyer area to stay out of fear. They are looking for you. Love you much, Renate Lynn Goodwin." She apparently did not ask for privacy or try to hide the note from the police. At that time the police brought Thomas back to 231 Breck Street where they collected a sweater that Thomas said she was wearing during the assault.

 Subsequently the police found Marlin and confirmed that he had been a party along with Thomas and Goodwin. Marlin was on crutches. Thereafter Thomas was brought back to the public safety building to identify this Marlin Evans and remained adamant that he had committed the assault.

Then, at about 10:14 AM, Thomas gave a new version of the evening. She related that she gone to the party, hired two hitmen ("Eion" and "Darion") to "take out" Morgan because he (Morgan) had raped her in the past. At about 2:15 PM Thomas was taken by the police to try to locate a house in the area of Melville and Stout Streets and while en route, she asked the officer to take her to Breck Street. While there in that area, petitioner approached the police car and stated that he wanted to talk to someone about what had happened at his house. Petitioner was placed in the back seat of the car with Thomas. They were both brought back to the police

station to be interviewed separately.

Thomas gave a third version this time, stating that she had witnessed the attack and that petitioner in fact was the attacker. She stated that she had given false information earlier because she viewed petitioner "almost like a savior" to her because he had "taken her off the street". In a written statement she admitted that she had lied and that she did not want to see anything happen to petitioner. She explained that she and the victim had been in the apartment on Breck Street getting ready to have sexual relations, when petitioner came in to the bedroom. Petitioner was extremely angry to find another man in his house. As the victim was trying to get dressed, petitioner hit him in the head with a crowbar and knocking him to the ground. According to Thomas, petitioner kept hitting the victim in the head until the crowbar broke. After that, Goodwin dragged him down the stairs and screamed that he was going to "kill him for fucking his girlfriend." Thomas told the police that Goodwin to ordered her to clean up the blood and to throw buckets of water on the floor. When she heard the police banging on the door, she got frightened and ran upstairs and tried to climb out the window where the police found her lying on the roof.

Meanwhile, the police had learned from Steve Judson, a neighbor of petitioner's, that Goodwin had gone to Judson's house after the attack and told him that he had found another man in his house and that he had beaten him. Judson signed a written statement for the police detailing his conversation with petitioner. Judson said that at about 1:00 AM, his neighbor, whom he knew as "Josh", came to his house and asked to come in. Judson was nervous and refused to let Goodwin in. Goodwin told Judson that he had been involved in a fight and that he had hit someone with a crowbar and dragged him outside. Judson subsequently identified

petitioner from a photo array.

While the investigation was proceeding, petitioner was being watched by various police officers from about 4 PM until 8:30 PM. However, he was not interviewed during that time. At about 8:30 PM, after obtaining the written statement from petitioner's girlfriend, two investigators met with petitioner. He was advised of his Miranda writes from a standard notification waiver card. Goodwin stated that he had completed the 11th grade and could read read and write English. After stating that he understood his rights, he waved them and agreed to speak with investigators with whom he's conversed until about 9:43 PM

Goodwin at first denied any involvement in the attack; specifically and absent any direct questions from investigators, Goodwin stated that he had "no blood on him". The suppression court found that the fact that the police officers conducted the interview, at times, using heated words and loud language. After an approximately 50-minute break while the defendant was left alone and still handcuffed to the table in the in the interview room. The officers returned and resumed the interview, advising him that his girlfriend, Thomas, had given a statement implicating him in the assault. At one point one of the detectives stepped outside and it was while Bronstein was alone with the defendant that petitioner made statements about what had happened at 231 Breck St. Following petitioner's verbal statements petitioner and the investigator went to the other detective's office to use the computer to generate a written statement while they were walking over there, petitioner apologized to the investigator for having lied to them previously. With both detectives present, Goodwin orally repeated his statements while one investigator type it on the computer. Goodwin read the first part of the statement aloud and then investigator read the rest of the statement aloud to him. Petitioner made

several changes to the statement before it was printed out, after which time he had the opportunity to review it again. He did so and at about 11:30 PM, he signed the statement.

The police subsequently met with another witness, Byron Ellerbe ("Ellerbe"), who was staying over at the house of Carrie Holmes ("Holmes"), one of petitioner's neighbors. In addition to obtaining a statement from Ellerbe the police showed Ellerbe the same photographic array that they had shown to Judson. Ellerbee selected Goodwins photograph. Ellerbee told the police that on February 8, 1998, he was visiting the home of his girlfriend Carrie Holmes, at 228 Breck Street. At about midnight or 12:30 AM, Ellerbee was in bed when he heard some unusual noises coming from outside; they sounded like a man moaning. He looked out the window and saw an individual whom he later identified as petitioner on the porch of the house across the street and it appeared to Ellerbee that petitioner was mopping the porch. About 15 minutes later, Ellerbee went outside and spoke briefly with petitioner who was still mopping the porch. Petitioner said that he had not called 911 because he did not have a phone and besides he was tired of these people coming around the neighborhood causing problems. Ellerbe went back to Holmes' house and called 911. *See* R.198 (Statement of Carrie Holmes); R.201-04 (Statement of Byron Ellerbe). On April 10, 1998, the police met with Carrie Holmes who resided at 228 Breck Street. Holmes gave a written statement, and also identified Goodwin in a photo array.

At the time that petitioner was questioned in connection the assault, the victim was still alive. However, Morgan subsequently was declared brain-dead, and the charges were raised from first degree assault to two counts of second degree murder under both intentional and depraved indifference to human life. According to the medical examiner, the victim was declared

brain dead based upon radiological studies showing that there was no blood flow to his brain (ischemia) just after 5 a.m. on the morning of February 9, 1998. T.750. The victim had suffered ruptured blood vessels within his brain, rupturing of the blood vessels overlying the brain, contusions of the brain, and a subarachnoid hemorrhage, an abnormal and very dangerous condition in which blood collects beneath the arachnoid mater, a membrane that covers the brain; this area, called the subarachnoid space, normally contains cerebrospinal fluid. After Morgan was declared brain-dead, he underwent an harvesting procedure so that his internal organs could be donated.

Petitioner testified at his trial. Although he admitted causing the head wounds suffered by the victim, he testified that he had not intended to cause Morgan's death. *E.g.*, T.791. Petitioner claimed that he did not realize what he was doing since had been drinking alcohol and smoking marijuana at the party he attended prior to the encounter with Morgan and Thomas. The jury was instructed on the defense of extreme emotional disturbance and the lesser included offense of first degree manslaughter. *See* T.879, 892. Initially, the jury returned a legally defective verdict finding petitioner guilty of both intentional murder and depraved indifference murder. T.933. The trial court re-instructed the jury, which, following further deliberations, returned a verdict convicting petitioner of intentionally murdering Morgan.

Petitioner was sentenced to an indeterminate term of 25 years to life in prison.

On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed the judgment of conviction, and the New York Court of Appeals denied leave to appeal. Petitioner brought several *pro se* motions to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10, as well as a *pro se* application for a

writ of error *coram nobis*. All of these applications were denied.

This timely federal habeas petition followed. For the reasons stated below, I recommend that Goodwin's request for a writ of habeas corpus be denied and that the petition be dismissed.

## IV.    Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2). *See, e.g., Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir.2003). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), *cert. denied sub nom. Parsad v. Fischer*, 540 U.S. 1091, 124 S.Ct. 962 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## V.     Analysis of the Petition

### A.      Fourth Amendment Violations (Ground One, Ground Two and Ground Three)

When asked to list the claimed grounds for relief on the form habeas petition, Goodwin

has written, "See, Attached." Petitioner at 6 (Docket No. 1). On unnumbered, typewritten pages attached to the form petition, he has listed four grounds for relief. "Ground One" is that the "prosecution failed to rebut the presumption that the warrantless search of the defendant's wallet found inside defendant's apartment was unconstitutional." *Id.* "Ground Two" alleges that the warrantless search of his apartment was unconstitutional. *Id.* "Ground Three" states that the trial court erred when it failed to suppress his statements to the police as the unattenuated by-product of an illegal arrest based on less than probable cause.[1] All three of these claims premised on alleged violations of petitioner's Fourth Amendment rights are precluded by the doctrine announced in *Stone v. Powell*, 428 U.S. 465 (1976): "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 481-82; *accord Graham v. Costello*, 299 F.3d 129, 134 (2d Cir.2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief . . . . [T]he bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim [.]").

Accordingly, Fourth Amendment claims may not be reviewed by a habeas court, except under two narrow exceptions: "(a) if the state has provided no corrective procedures at all to redress

---

[1] "Ground Four" pertains to the late notice served by the prosecution under N.Y. Crim. Proc. Law § 710.30 and is discussed further, *infra*. Immediately underneath "Ground Four" is the heading "POST CONVICTION MOTIONS GROUNDS". There are two listed, both of which are claims that trial counsel rendered ineffective representation. These are discussed further, *infra*.

the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir.1992) (citing *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir.1977) (*en banc*)). Neither of these exceptions applies in this case.

Goodwin cannot and does not contend that New York failed to provide a corrective procedure to redress his alleged fourth amendment claim. Indeed, as the Second Circuit has noted, "the 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.* . . . , as being facially adequate.'" *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989) and citing *Gates*, 568 F.2d at 837 & n. 4; *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)); *see also Taylor v. Kuhlmann*, 36 F. Supp.2d 534, 549 (E.D.N.Y.1999) (citations omitted).

Petitioner was afforded a two-day pretrial evidentiary hearing, at which his Fourth Amendment claims were addressed and litigated. The trial court, in a thorough, well-reasoned twenty-page Opinion, Decision Order, made extensive findings of fact and conclusions of law. *See* Respondent's Appendix of Exhibits ("Resp't Ex.") at 220-47. Goodwin's appellate counsel raised all of these issues again in a well-argued, thorough brief to the Appellate Division, which likewise denied his Fourth Amendment challenges in a Memorandum Decision and Order, *see* Resp't Ex. at 280-81.

All Goodwin is asserting is that the trial court erroneously decided his motion to suppress, and that the appellate court erroneously upheld the trial court's ruling. Thus, he is

requesting that this Court conduct a *de novo* factual review of his claims. The relief requested, however, is expressly precluded by the *Stone v. Powell* doctrine. As the Second Circuit has explained many times: A petitioner's mere dissatisfaction or disagreement with the outcome of a suppression motion is not sufficient to establish that an "unconscionable breakdown" occurred in the existing process in violation of the petitioner's Fourth Amendment rights under the Constitution. *Capellan*, 975 F.2d at 71 ("[T]o the extent that [petitioner] claims that the Appellate Division erred in its ruling . . . , this would not give us authority to review his claims since a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process.") (emphasis supplied); *Gates v. Henderson*, 568 F.2d at 840 ("*Stone v. Powell* . . . holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts."). *Accord, e.g.*, *Watkins v. Perez*, No. 05 Civ. 477(GEL), 2007 WL 1344163, *23 (S.D.N.Y. May 30, 2007) (holding that without more, rejection by state appellate court of petitioner's Fourth Amendment claims, is not an "conscionable breakdown" in the state's corrective process; noting that a "habeas court cannot grant relief simply because it may disagree with the state court's resolution of the claim"); *Woods v. Kuhlmann*, 677 F. Supp. 1302, 1306 (S.D.N.Y.1988) ("The doctrine of *Stone v. Powell*, however, forbids de novo review of state court fact-finding on a Fourth Amendment issue particularly where, as here, the petitioner can claim only that the issue was wrongly decided."); *Huntley v. Superintendent*, No. 9:00CV191, 2007 WL 319846, at *8 (N.D.N.Y. Jan.30, 2007); *Gonzalez v. Superintendent, Sullivan Corr. Fac.*, 761 F. Supp. 973, *977 (E.D.N.Y.1991) (rejecting habeas petitioner's claim that the state court erroneously denied his request for a probable cause hearing, and that such a denial was an

"unconscionable breakdown" in the process afforded by the state; district court found that petitioner was provided with a full and fair opportunity to litigate his fourth amendment claim in the state courts and "[t]he fact that petitioner was denied his request for such a hearing d[id] not, in and of itself, affect the legitimacy of the state process"). For all of the foregoing reasons, federal habeas review of Goodwin's Fourth Amendment claims is unavailable based upon the doctrine of *Stone v. Powell*. Accordingly, Grounds One, Two and Three should be dismissed.

**B.      Late Notice Under N.Y. Crim. Proc. Law § 710.30 (Ground Four)**

As "Ground Four", petitioner contends that the trial court erred in refusing to preclude a certain witness from identifying him based on the prosecution's failure to give timely notice pursuant to New York Criminal Procedure Law § 710.30. On direct appeal, the Appellate Division held, "[t]hat witness ultimately did not testify at trial, and thus any error was harmless."

It is well settled that "federal habeas corpus relief does not lie for errors of state law", absent a corresponding violation of federal constitutional rights. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). A claim that the trial court violated state law is not cognizable in a federal habeas proceeding since "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67-68.

Even though there was a C.P.L. § 710.30 defect in this case, such an error does not implicate any federal right. *E.g.*, *Aziz v. Warden of Clinton Correctional Facility*, No. 92 Civ. 0104, 1992 WL 249888, at *10 (S.D.N.Y. Sept. 23 1992) ("Violation of this state right to notification does not rise to the level of a constitutional violation."); see *also Brown v. Harris*, 666 F.2d at 785. The notice requirements set forth in C.P.L. § 710.30 do not arise from the

federal constitution but rather are creation of state statute.Courts in this circuit faced with habeas claims grounded in C.P.L. § 710.30 have repeatedly held that such claims do not implicate federal constitutional rights, and accordingly are not cognizable on habeas review. *Brown v. Harris*, 666 F.2d 782, 785 (2d Cir.1981) ("Brown cites no case indicating that this statute [N.Y. Crim. Proc. Law § 710.30], or that a notice requirement in general, is constitutionally mandated."), *cert. denied*, 456 U.S. 948 (1982); *Moss v. Phillips*, No. 03-CV-1496, 2008 WL 2080553, at *12 (N.D.N.Y. May 15, 2008) (holding that "alleged violations of CPL § 710.30's notice provision–a state procedural law–do not provide an independent ground for federal habeas relief."); *Dotson v. Ercole*, No. 06 Civ. 7823, 2007 WL 1982730, at *4 (S.D.N.Y. Jul.10, 2007) ("Violation of this state right to notification does not rise to the level of a constitutional violation.") (quoting *Aziz v. Warden of Clinton Corr. Fac.*, No. 92 Civ. 0104, 1992 WL 249888, at *10 (S.D.N.Y. Sept. 23 1992), *aff'd*, 993 F.2d 1533 (2d Cir.1993), *cert. denied*, 510 U.S. 888 (1993)).

Because Goodwin has failed to show that any of his federal constitutional rights were violated by the prosecution's service of late notice under C.P.L. § 710.30 (regarding a witness who ultimately did not testify at trial), Ground Four should be dismissed.

### C.    Ineffective Assistance of Trial Counsel ("Post Conviction Motions Grounds")

Goodwin asserts two claims of ineffective assistance of trial counsel. First, he contends that "trial counsel rendered ineffective representation where counsel failed to give defendant any advice as to how to deal with the plea bargain offer." This claim was summarily denied by the state courts when it was raised in Goodwin's C.P.L. § 440.10 motions.  As the second ground for finding trial counsel to have been ineffective, Goodwin states that"defense counsel failed to

question the victim's diagnosis as brain death [sic] or determine if the diagnostic tests performed on the victim comported with accepted medical practice." *See* Petition, last page of attachments (Docket No. 1).

In order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy a two-part test. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, he must establish that his attorney's performance was so deficient that it "fell below an objective standard of reasonableness." *Id.* In applying the first prong of the *Strickland* test, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted). Although this presumption can be overcome, the burden of proving that counsel's performance was unreasonable lies with the petitioner. *See Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). To satisfy the second part of the *Strickland* test, a habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700.

### 1.    Failure to Properly Advise Petitioner Regarding Plea Offer

In Goodwin's first ineffective assistance claim, he contends that "trial counsel rendered ineffective representation where counsel failed to give defendant any advice as to how to deal with the plea bargain offer." This claim was summarily denied by the state courts when it was raised in Goodwin's C.P.L. § 440.10 motions.

A defendant's Sixth Amendment right to counsel attaches at all critical stages in the proceedings "after the initiation of formal charges," *Moran v. Burbine*, 475 U.S. 412, 431 (1986), which has been held to include plea negotiations. *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (citing, inter alia, *Boria v. Keane*, 99 F.3d 492, 496-97 (2d Cir.1996) (holding that ineffective assistance of counsel during plea negotiations justified § 2254 habeas relief)). "The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case . . . [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial decision.'" *Gordon,* 156 F.3d at 380 (quoting *Boria*, 99 F.3d at 496-97 (quoting Anthony G. Amsterdam, Trial Manual 5 for the Defense of Criminal Cases (1988)); *see also United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992). In the context of the assistance of counsel with respect to the failure to properly advise regarding a guilty plea, a petitioner must show that but for counsel's deficient performance, there exists a reasonable probability that he would have made a different decision regarding the guilty plea. *See United States v. Torres*, 129 F.3d 710, 716 (2d Cir.1997); *Boria v. Keane*, 99 F.3d at 496-97.

Goodwin stated in his C.P.L. § 440.10 motion, *see* Resp't Ex. 323 *et seq.*, that trial counsel "(a) failed to give his informed opinion as to whether or not the plea appear[ed] desirable and it [sic] in defendant's best interests to accept it; (b) never gave defendant any advice or suggestions as to how to deal with the People's offered plea bargain; and (c) did not advice [sic] the defendant of the substantial differences between the sentence exposure of going to trial and a plea acceptance." Resp't Ex.323; *see also id.* at 338. Before filing the C.P.L. § 440.10 motion, petitioner had written to his trial attorney asking him "some questions in respect

to the plea bargain offer the District Attorney made prior to my going to trial." Resp't Ex. at 339.

The attorney wrote to petitioner stating,

> I have no recollection of our discussions without the opportunity to review the trial file. That presents some difficulty when I represented you, I was employed by the Monroe County Public Defender's Office. I left that position in 1999. The files and materials regarding your trial are held and stored by that office. I would urge you to contact that office at the address provided to review that file.

*Id.* at 340. Petitioner's trial attorney copied the Monroe County Public Defender on that letter and listed the office address for petitioner's benefit. However, it does not appear that petitioner ever followed up on trial counsel's recommendation to contact the Public Defender's Office to obtain the file from his state-court criminal proceeding.

After receiving the letter from trial counsel, petitioner then prepared an affidavit which he submitted in support of the C.P.L. § 440.10 motion. He averred, in pertinent part, as follows:

> 2.  I was informed by my trial attorney, . . . , preceding my trial that the prosecution had brought to the table, as a plea bargain, an offer of Manslaughter.
>
> 3.  He told me in respect to the plea offer that "you can accept it or refuse it, it is up to you." I told him, I did not want to accept the offer; then I was ushered to the court room.
>
> 4.  I did not accept the plea because, at the time, I thought there were no difference [sic] between murder and manslaughter for both had to do with the willful killing of someone, and my intentions were not to kill the decedent.
>
> 5.  [Trial counsel] and I never had a conversation in respect to the distinction between manslaughter and murder; and at no time he told me to accept or reject the plea offer.
>
> 6.  [Trial counsel] never told me whether or not the prosecution had a strong case. If he would have apprised me that we did not have a chance to win and it was in my best interest to accept the plea, I would have accept the plea offer.

. . .

Resp't Ex. at 338.

Based upon the record before this Court, petitioner has failed to satisfy the requirements

of *Strickland* with respect to his claim of ineffective assistance of counsel regarding the plea offer. *Cf. Santobello v. United States*, No. 97 Civ. 4404(RPP), 1998 WL 113950, at *2 (S.D.N.Y. Mar.13, 1998) (a petition is subject to summary dismissal where a petitioner presents only conclusory allegations unsupported by specifics). Here, petitioner's allegations regarding the alleged plea offer and trial counsel's advice in connection thereto are supported only by his own affidavit; he offers no other evidence regarding the alleged conversations he had with his trial counsel regarding his decision to stand trial. *See Germosa v. United States*, No. 02 Civ. 817(SWK), 2003 WL 1057212, at *3 (S.D.N.Y. Mar. 11, 2003) (§ 2255 petitioner failed to establish that trial counsel's performance was unreasonable in connection with plea advice given where petitioner's allegations were "wholly conclusory and unsupported by any independent evidence"); *cf. Agyekum*, No. 01 CIV. 5808(RWS), 2002 WL 1000950, at *5 (S.D.N.Y. May 16, 2002) ("Post-hoc complaints about the strategy or tactics employed by trial counsel, or complaints that trial counsel did not conduct a sufficiently vigorous pretrial investigation, are typically found to be insufficient to satisfy *Strickland*.") (citing *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir.1991) (finding that defendant's displeasure with strategy employed by trial counsel insufficient to establish ineffectiveness); *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir.1987) (fact that appellate counsel would have conducted more vigorous pretrial discovery does not establish ineffectiveness of counsel)."). Moreover, "even if a defendant makes out facially plausible allegations of ineffectiveness," *Agyekum*, 2002 WL 1000950, at *5, which I have not found to be the case here, "a district court has the discretion to rely on a defendant's sworn statements in open court and to hold defendant to them[,]" *id.* (citing *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("The subsequent presentation of conclusory

allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *United States v. Torres*, 129 F.3d at 716-17 (district court properly rejected claims that guilty plea was involuntary because defense counsel coerced plea and plea was entered out of fear that defense counsel was unprepared to go to trial where such claims were contradicted by defendant's plea allocution); *United States v. Gonzales*, 970 F.2d 1095, 1099-1101 (2d Cir.1992) (defendant's allegations about ineffectiveness of his lawyer in relation to guilty plea "merely contradicted [defendant's] earlier statements made under oath at his plea allocution" and therefore did not warrant a hearing).")).

Goodwin has failed to come forward with credible evidence to support his ineffective assistance claim that counsel erroneously advised him to go to trial rather than accept a plea bargain. Accordingly, this aspect of his ineffective assistance claim should be dismissed.

### 2. Failure to question the medical evidence regarding the cause of the victim's death

As the second ground for finding trial counsel to have been ineffective, Goodwin states that "defense counsel failed to question the victim's diagnosis as brain death [sic] or determine if the diagnostic tests performed on the victim comported with accepted medical practice." Petition, last page of attachments (Docket No. 1). Goodwin contends that this omission deprived the jury of "vital" evidence necessary for the jury "to make their determination on intent and causation, since 'to be found guilty of intentional murder, a defendant must intend to cause the death of the person, Penal Law 125.25(1). Proof of causation is mandatory for any homicide conviction." Resp't Ex. at 297 (citations omitted). Stated another way, Goodwin appears to be arguing that the medical examiner improperly diagnosed the victim as brain dead, and "the only way this issue could have been addressed was by calling in physicians . . . to testify, or by calling

an expert for the defense . . . . ." *Id.* at 298.

Under the circumstances presented here, Goodwin cannot establish that his trial attorney was constitutionally ineffective based on his decision not to hire a medical expert. "In general, whether or not to hire an expert is the type of strategic choice by counsel that may not be second-guessed on habeas corpus review." *Murden v. Artuz*, 253 F. Supp.2d 376, 389 (E.D.N.Y. 2001) (citing *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to 'whether to call specific witnesses–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation'") (citations omitted), *cert. denied*, 532 U.S. 1007 (2001); *Strickland*, 466 U.S. at 689 (actions or omissions by counsel that "might be considered sound trial strategy" do not constitute ineffective assistance) (citations omitted); *compare with Pavel v. Hollins*, 261 F.3d 210 (2d Cir.2001) (failure to call medical expert in sexual abuse case considered cumulatively with other errors constituted ineffective assistance); *Lindstadt v. Keane*, 239 F.3d 191, 199-205 (2d Cir.2001) (same)), *aff'd* 60 Fed. Appx. 344 (2d Cir. Mar. 13, 2003). In *Murden*, although the habeas petitioner correctly argued that causation was a critical issue at trial, the district court rejected his contention that defense counsel would have been able to prove that the hospital's treatment of the victim was an intervening cause of her death if he had only hired an expert because it was "based on nothing more than speculation." *Murden*, 253 F. Supp.2d at 389 ("Petitioner [Murden] has not come forward with affidavits or other admissible evidence showing that there is an expert witness who would have testified that any of the hospital's medical procedures were unrelated to [the victim]'s fall. Absent such evidence, which could have created a reasonable doubt as to whether the hospital's care was the sole cause of [the victim's] death, petitioner has not shown that the outcome of his

trial would have been any different had his attorney hired an expert.").  As was the case in *Murden*, Goodwin has failed to offer any affidavits or other admissible evidence demonstrating the existence of an expert witness who would have testified that the diagnosis of brain-death of the victim was incorrect.. *See id.* Thus, Goodwin has failed to present any proof which could have created a reasonable doubt as to whether the treatment that Morgan received while in the hospital was the sole cause of his death. *See id.* Goodwin accordingly has not shown that the outcome of his trial would have been any different had his attorney hired an expert. *See id.* Therefore, this claim of ineffective assistance of trial counsel should also be denied.

## VI.   Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by petitioner Joshua Goodwin be **denied**. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, the Court recommends that no certificate of appealability should issue with respect to any of petitioner's claims.


/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: August 11, 2009
        Buffalo, New York.

-20-

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1ˢᵗ Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: August 11 , 2009
       Buffalo, New York